IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
(ATLANTA DIVISION)

| | |
|---|---|
| OSIRIS THERAPEUTICS, INC.,<br><br>                              Plaintiff,<br><br>            v.<br><br>MIMEDX GROUP, INC.,<br><br>                              Defendant. | Complaint for a Civil Case<br><br>Case No.<br>_____<br><br>DEMAND FOR JURY TRIAL |

Osiris Therapeutics, Inc. ("Plaintiff" or "Osiris"), by and through undersigned counsel, submits this Complaint against MiMedx Group, Inc. ("Defendant" or "MiMedx").

## NATURE OF THE ACTION

1.     Osiris and MiMedx are direct competitors in the market for regenerative cellular and tissue-based products used to treat injuries and wounds. Each company typically sells its products through distributors.

2.     From 2013 to 2015, Osiris's distributor was Stability, Inc. (d/b/a Stability Biologics) ("Stability"). Under the terms of the distribution agreement,

Stability continued to owe Osiris various obligations after the agreement terminated. Ex. 1, Distribution Agreement at 1315.

3.      On January 10, 2016, MiMedx disclosed that it had signed an agreement to acquire Stability. *MiMedx Signs Definitive Agreement to Acquire Stability Biologics; Company Issues Revised Guidance and Expects 2016 Revenue in the Range of $260 to $270 Million and Adjusted EPS in the Range of $0.33 to $0.37*, PR NEWSWIRE Jan. 10, 2016, *available at* https://www.prnewswire.com/news-releases/mimedx-signs-definitive-agreement-to-acquire-stability-biologics-300201988.html. In the Press Release, MiMedx's CEO announced, among other things, that Stability "brings an experienced sales distribution organization consisting of about 100 independent sales representatives that are focused in specific surgical areas. The acquisition will also allow MiMedx to immediately bring our surgically related products to the market through the Stability Biologics sales representatives." *Id*.

4.      The transaction closed on January 13, 2016. Under the terms of the acquisition, the surviving entity acquired all of Stability's assets, including "property, rights, privileges, immunities, powers, franchises, licenses and authority." It also assumed Stability's "debts, liabilities, obligations, restrictions

and duties." Ex. 3, Agreement and Plan of Merger at 19. This included Stability's contractual obligations owed to Osiris.

5.     From January 2016 through October 2017, MiMedx and its wholly owned and controlled subsidiary, Stability, breached several ongoing obligations owed to Osiris.

6.     MiMedx and Stability failed to refund Osiris approximately $1.3 million in commissions that Osiris had advanced Stability for expected sales of Osiris products, which did not occur.

7.     MiMedx and Stability breached the obligation to return to Osiris approximately $2.2 million of Osiris products held in inventory, which they let expire, valueless.

8.     MiMedx and Stability breached the obligation to make planned payments owed to Osiris that total approximately $2.9 million.

9.     Stability and MiMedx also breached the ongoing obligation to protect Osiris's confidential information, including trade secrets, customer lists, and sales information. Instead, that confidential information was exploited to sell MiMedx products—including those that competed with Osiris products—to Osiris's customers.

3

10.     These breaches caused at least $6.4 million in actual damages, in addition to currently unascertainable damages caused by the improper use of Osiris's confidential information.

11.     MiMedx controlled Stability and is liable for the conduct of both the parent and its subsidiary. Osiris filed an arbitration proceeding to recover its damages. Because it was the sole owner and controller of Stability, MiMedx participated in that arbitration. Over the course of the arbitration, Osiris spent at least $340,000 in attorneys' fees and costs.

12.     In August 2017, MiMedx announced that it was divesting Stability, but that Stability would pay MiMedx $3.5 million. The transaction closed in September 30, 2017, and MiMedx, having stripped Stability of assets, withdrew from the arbitration proceeding.

13.     MiMedx and Stability are jointly and severally liable for Osiris's damages (including punitive damages) because they are joint tortfeasors responsible for Osiris's injuries.

### JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C.

§ 1332(a)(1). Complete diversity exists between Osiris and MiMedx and the

amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     The Court has jurisdiction over MiMedx as its headquarters and

principal place of business is in Marietta, Georgia.

16.     Venue is also proper in this district, pursuant to 28 U.S.C. § 1391(b),

as it is where MiMedx resides.

### PARTIES

17.     Osiris is incorporated and has its principal place of business in

Maryland. It is a leading regenerative medicine company that develops and

markets products to serve the wound and orthopedic markets. Osiris's products

include Ovation® and Grafix®. Osiris utilizes distributors to sell its products to

doctors, hospitals, and clinics.

18.     MiMedx is incorporated in Florida and has its headquarters and

principal place of business in Marietta, Georgia. Nationally, MiMedx is one of

Osiris's primary competitors in the market for both wound and orthopedic

products.

**STATEMENT OF FACTS**

**I.      Osiris and Stability enter into a three-year distribution agreement.**

19.      Osiris and MiMedx are direct, head-to-head competitors in the market for regenerative cellular tissue-based products used by doctors, hospitals, and clinics to treat orthopedic injuries and wounds. "Competition in the regenerative medicine field is intense." MiMedx Grp., Inc., Annual Report (Form 10-K, at 11) (Mar. 1, 2017).  To sell their products, Osiris and MiMedx each use distributors.

20.      In January 2013, Osiris entered into a three-year agreement with Stability that gave Stability near-exclusive distribution rights to market and sell its product, Ovation®, throughout the United States and Canada. Ex. 1, at 4.[1]

21.      In February 2013, the parties amended that agreement to give Stability exclusive rights to market and sell a second Osiris product, Grafix®, in several states, and non-exclusive rights to sell it in the remaining territory. Ex. 2, Amendment to the Distribution Agreement at 12, 4.[2] Collectively, these agreements are referred to as "the distribution agreement."

---

[1] Osiris was phasing out an earlier distribution agreement that granted a different distributor to market and sell Ovation® for a limited time in Texas. Ex. 1, at 1, 4, 21.

[2] Stability had the exclusive right to sell Grafix® in Florida, Georgia, and Tennessee. Ex. 2, at 4.

22.     Among other things, Stability agreed not to market or sell any products that competed with Ovation® or Grafix®, unless such sales were otherwise approved by the parties' joint steering committee ("JSC"). Ex. 1, at 4; Ex. 2, at 6.

23.     Osiris consigned its products to Stability, and also advanced it commissions based on expected sales. Ex. 1, at 4, 910; *id*., at 7-8.

24.     Stability, amongst other things, was required to sell (or return) Osiris's products and to protect Osiris's confidential information. *Id*., at 4, 14-15. "Confidential information," a defined term, included "all proprietary and confidential information," such as "trade secrets," "customer and potential customer lists and identities," "product sales plans," and "sales information." *Id*., at 12.

25.     The confidential information that Stability gained access to was not generally known outside of Osiris's business. Osiris expended time, labor, and money in developing its confidential information, and this information had independent economic value to Osiris. A competitor's knowledge of Osiris's confidential information would harm Osiris by giving it a competitive edge. As MiMedx disclosed, its own "trade secrets … provide[d it] with important

competitive advantages." MiMedx Grp., Inc., Annual Report (Form 10-K, at 5) (Mar. 1, 2017).

26.    Osiris took reasonable efforts to maintain the secrecy of its confidential information, as evidenced by, among other measures, the inclusion of detailed confidentiality clauses in the distribution agreement. Ex. 1, at 12, 1415. Stability and its employees were to receive and maintain such information in strict confidence, use it only to perform their obligations under the agreement, and not disclose it to anyone else. *Id*., at 14-15. When the agreement terminated, Stability promised (and failed) to return or destroy such information. *Id*., at 15. Further, Stability's obligations to maintain the confidentiality of Osiris's confidential information survived the termination of that agreement. *Id*.

27.    The distribution agreement terminated on December 31, 2015, but Stability's obligations to Osiris did not end. For example, the agreement specifically provided that if Stability had unsold Osiris products in its inventory, it had six months to sell those products "at commercially reasonable fees." *Id*., at 13-14. If, at the end of that period, Stability still held Osiris products in inventory, it was to offer those products to Osiris. *Id*.

28.     In addition, "neither Party [was] relieved from liability for any breach of any representation, warranty or agreement [under the distribution agreement that] occur[ed] prior to [its] termination." *Id*., at 13.

29.     Additionally, "[t]he confidentiality obligations contained in [the distribution agreement] shall survive termination of [the agreement] for a period of ten years." *Id*., at 15.

## II.     MiMedx acquires Stability, merging it into its existing operations as a wholly owned subsidiary.

30.     Upon information and belief, during the second half of 2015, MiMedx and Stability began to discuss both merging their companies and selling MiMedx products to Osiris's customers (including MiMedx products that competed with Osiris's). During the same period, Stability's sales of Osiris's products dropped significantly over prior periods.

31.     On January 10, 2016, at a time when Stability still had ongoing obligations to Osiris, MiMedx and Stability entered into an Agreement and Plan of Merger. Ex. 3, at cover page & 1. On January 13, 2016, that transaction closed. MiMedx Grp., Inc., Current Report (Form 8-K, at Item 1.01) (Jan. 13, 2016).

32.     As part of the merger, Stability was reincorporated in Georgia, where MiMedx is headquartered, and became "a newly created wholly owned

subsidiary," Stability Biologics, LLC (collectively referred to as "Stability").

MiMedx Grp., Inc., Current Report (Form 8-K, at Item 1.01) (Jan. 13, 2016).

MiMedx paid $10 million for the company in a combination of cash and stock,

"plus assumed debt."

33.    MiMedx, through its wholly owned and controlled subsidiary,

acquired Stability's "property, rights, privileges, immunities, powers, franchises,

licenses and authority," and assumed its "debts, liabilities, obligations, restrictions

and duties." Ex. 3, at 19 (§ 2.05—Effects of the Merger). MiMedx disclosed that as

of December 2015, Stability held over $12 million in assets (including inventory),

and approximately the same amount in liabilities, including accounts payable and

accrued expenses. MiMedx Grp., Inc., Current Report (Form 8-K/A) (Jan. 13,

2016) (Balance Sheets).

34.    Notwithstanding the ongoing obligations to Osiris, MiMedx and

Stability were incentivized to sell MiMedx products in lieu of the Osiris products

already held in the distributor's inventory. Sales of MiMedx products would earn

"an amount equal to one times the gross profit margin." MiMedx Grp., Inc.,

Current Report (Form 8-K, at Item 1.01) (Jan. 13, 2016). During 2016, gross

margins were 86.8%. MiMedx Grp., Inc., Annual Report (Form 10-K, at 41) (Mar.

1, 2017). But if sales were under $12 million, then the earnout rate would be

reduced by half, thus further incentivizing sales of MiMedx products over the Osiris product held in inventory. MiMedx Grp., Inc., Current Report (Form 8-K, at Item 1.01) (Jan. 13, 2016).

35.    As MiMedx itself has recognized, distributors that do not have an exclusive arrangement with a manufacturer "may devote insufficient sales efforts to [its] products, or may focus their sales efforts on other products that produce greater commissions for them, which could have an adverse effect on [the manufacturer's] operations and operating results." MiMedx Grp., Inc., Annual Report (Form 10-K, at 19) (Mar. 1, 2017).

36.    MiMedx also disclosed that it sold $2.4 million worth of products to Stability prior to its acquisition of the distributor on January 10, 2016. Upon the acquisition, MiMedx "eliminated a $2.4 million receivable related to products sold to Stability prior to the acquisition." MiMedx Grp., Inc., Annual Report (Form 10-K, at 35, 69) (Feb. 29, 2016).

37.    Further, MiMedx disclosed that it recorded $5.33 million in intangible assets for "Customer Relationships" to reflect gains from its acquisition of Stability and an additional $6.79 million of "Patents & Know-How." MiMedx Grp., Inc., Annual Report (Form 10-K, at 61, 63, 65) (Mar. 1, 2017). These intangible assets included Osiris's confidential information that Stability possessed, such as trade

secrets, customer lists, potential customer lists, product sales plans, and sales information.

### III. MiMedx and Stability, on MiMedx's instruction, breached the ongoing obligations of the distribution agreement.

38.     MiMedx and Stability, on MiMedx's instruction, breached the distribution agreement when they failed to either sell or return approximately $2.2 million of Osiris products they held in inventory. MiMedx and Stability allowed those products to expire while in their custody.

39.     MiMedx and Stability, on MiMedx's instruction, breached the distribution agreement when they failed to repay Osiris approximately $1.28 million in advanced commissions that Osiris paid for products that were never sold. *See* Ex. 1, at 7.

40.     In March 2016, MiMedx also caused its wholly owned subsidiary, Stability, to cease making the monthly payments owed to Osiris for sales of Ovation® under a preexisting payment plan ("the Ovation Payment Plan").

41.     Specifically, in September 2015 Stability entered into an agreement with Osiris pursuant to which Stability would pay Osiris ten monthly payments of $590,015 to satisfy a $5.9 million debt for Stability's sale of Ovation® to a related entity. Ex. 4, September 28, 2015 Letter.

42.     Osiris received the required monthly payments from October 2015 through February 2016, a month after Stability was acquired. On March 4, 2016, Osiris inquired about a late payment, and was informed that Stability was "waiting to hear back from MiMedx['s] CEO on this." Ex. 5, March 4, 2016 Email Re: Osiris Monthly Payment at 1.

43.     Osiris did not receive the last five payments owed under the Ovation Payment Plan, suffering $2,950,075 in damages.

## IV.     MiMedx and Stability misused Osiris's confidential information to sell MiMedx's products.

44.     Under the distribution agreement, Stability was prohibited from disclosing to others Osiris's confidential information, including its trade secrets, customer lists, potential customer lists, the identities of its customers, product sales plans, and sales information. Ex. 1, at 12, 1415. Stability's obligations to maintain that confidentiality survived the distribution agreement's termination. *Id.*, at 15.

45.     MiMedx, which wholly owned the reincorporated Stability and its assets and liabilities, knew, or should have known, that under the distribution agreement, Stability was obligated to maintain the secrecy of Osiris's confidential information.

46.     Upon information and belief, during the merger talks, Stability and MiMedx discussed targeting Osiris's customers for sales of MiMedx products, including MiMedx products that directly competed with Osiris products.

47.     Stability and MiMedx did, in fact, sell MiMedx products (including those that competed with Osiris's) through Stability's distribution network. MiMedx Grp., Inc., Annual Report (Form 10-K, at 35, 69) (Feb. 29, 2016).

48.     With the benefit of Osiris's confidential information, MiMedx improperly obtained a competitive advantage vis-à-vis Osiris and was unjustly enriched by using Osiris's confidential information to sell its own products.

49.     At present, it is not possible to ascertain Osiris's damages related to the resulting loss of sales and reputational harm or the unjust benefit of these actions to MiMedx.

## V.     Osiris's efforts to recover monies owed.

50.     Osiris attempted, in good faith, to recover monies owed as result of these breaches from MiMedx and Stability.

51.     In May 2016, Osiris filed an arbitration claim against MiMedx's wholly owned subsidiary, Stability. Because it was the sole owner and controller of Stability, MiMedx participated in that arbitration.

52.     In August 2017, MiMedx announced that it would divest Stability and would receive "a promissory note issued by Stability Biologics in the principal amount of $3.5 million in favor of MiMedx." The spin-off would also waive all claims to the earn-out consideration offered under the merger, and, importantly, MiMedx would "book a one-time gain on this transaction of approximately $8 million to $10 million."  *MiMedx Signs Definitive Agreement to Divest Stability Biologics Subsidiary as Part of Company's Strategic Focus on Biopharma*, PR NEWSWIRE, Aug. 18, 2017, *available at* https://www.prnewswire.com/news-releases/mimedx-signs-definitive-agreement-to-divest-stability-biologics-subsidiary-as-part-of-companys-strategic-focus-on-biopharma-300506633.html. MiMedx would also retain access to Stability's sales representative organization via a distributor agreement with Stability. *Id*. In other words, MiMedx would keep all of Stability's assets, post a gain, *and* would require Stability to pay MiMedx an additional $3.5 million.

53.     When the transaction closed in September 30, 2017, MiMedx, having stripped all of Stability's assets, stopped participating in the arbitration proceeding.

54.     MiMedx is liable for approximately $340,000 that Osiris has spent to date in attorneys' fees related to the arbitration proceeding.

55.     As a result of MiMedx's and Stability's actions, Osiris sustained at least $6.8 million in compensatory damages and costs, including approximately: (i) $1.3 million in unreimbursed pre-paid commissions; (ii) $2.2 million in products that were neither sold nor returned, and which expired in MiMedx's and Stability's custody; (iii) $2.9 million under the Ovation Payment Plan; and (iv) $340,000 in attorneys' fees related to the arbitration. Osiris also incurred additional unascertainable damages, reputational damage, and competitive disadvantages from the breaches discussed above.

## CAUSES OF ACTION

### COUNT 1
### Breach of Contracts

56.     Osiris re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

57.     MiMedx and Stability, MiMedx's wholly owned and controlled subsidiary, had ongoing obligations to Osiris under both the distribution agreement and the Ovation Payment Plan. Those obligations were breached when MiMedx caused Stability to: (i) sell MiMedx products at a time it was barred from doing so; (ii) fail to sell or return $2.2 million of Osiris products; (iii) fail to repay $1.3 million in commissions advanced; (iv)  use confidential information to sell

MiMedx's products, including those that competed with Osiris products; and, (v) fail to pay the remaining $2.9 million owed pursuant to the Ovation Payment Plan.

58.    MiMedx was aware of these agreements when it negotiated with, and later acquired, Stability. MiMedx merged Stability into its existing operations, at which point the surviving entity acquired all of Stability's "property, rights, privileges, immunities, powers, franchises, licenses and authority," and assumed all of its "debts, liabilities, obligations, restrictions and duties." Ex. 3, at 19 (§ 2.05—Effects of the Merger).

59.    The distribution agreement also has post-termination obligations. "[N]either Party [was] relieved from liability for any breach of any representation, warranty or agreement [under the distribution agreement that] occur[ed] prior to [its] termination." Ex. 1, at 13.

60.    MiMedx so dominated and controlled Stability that the two entities were, in substance, a single business enterprise. For example, Stability would not pay Osiris under the Ovation Payment Plan until after it heard back from MiMedx's CEO. Ex. 4, at 1. No additional payments were made. Another example of MiMedx's domination and control over its wholly owned subsidiary was its insertion of itself and active participation in the arbitration proceeding Osiris filed

17

against Stability. A third example reflecting MiMedx's domination and control is the annual report for 2016 that MiMedx filed with the SEC, in which MiMedx, in its consolidated financial statements, blended Biologic's assets, liabilities, and revenues with its own. MiMedx Grp., Inc., Annual Report (Form 10-K, at 50-53) (Mar. 1, 2017).

61.     MiMedx used its domination and control over Stability to cause or induce its wholly owned subsidiary to breach the distribution agreement and the Ovation Payment Plan. Those breaches proximately caused Osiris injury.

62.     By reason of the actions, Osiris incurred approximately $6.4 million in compensatory damages and additional unascertainable, but foreseeable, compensatory damages resulting from MiMedx's misuse of Osiris's confidential information.

## COUNT 2
## Tortious Interference With Contracts
### (*In the alternative to Count 1*)

63.     Osiris re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

64.     Again, there are two agreements at issue here: (i) the distribution plan and (ii) the Ovation Payment Plan. Stability and Osiris are parties to each of those agreements. Under each agreement, Stability owed Osiris contractual obligations.

65.     MiMedx knew of both contracts during or around the time MiMedx negotiated with, and later acquired, Stability. MiMedx intentionally interfered with each of those contracts. And MiMedx's interference induced Stability to breach them.

66.     When MiMedx intentionally interfered with the distribution agreement by inducing Stability to breach it by selling competing MiMedx products, it employed wrongful means as it enabled Stability to sell MiMedx products at a time when it was barred from doing so under the contract.

67.     When MiMedx intentionally interfered with the distribution agreement by inducing Stability to breach it by not refunding to Osiris approximately $1.28 million in prepaid commissions, it employed wrongful means as it enabled Stability to keep monies it never earned.

68.     When MiMedx intentionally interfered with the distribution agreement by inducing Stability to breach it by failing to sell and/or return approximately $2.2 million in Osiris products in its inventory, and later allowing

the products to expire, MiMedx acted contrary to Stability's economic interests as it negated Stability's ability to earn commissions from the sale of those products.

69.     When MiMedx intentionally interfered with the distribution agreement by inducing Stability to give it access to Osiris's confidential information, and/or induced Stability to use such confidential information on MiMedx's behalf, it again employed wrongful means when that information was improperly used to sell MiMedx's products—including those that competed with Osiris's.

70.     Finally, when MiMedx intentionally interfered with the Ovation Payment Plan by inducing Stability to breach it by failing to make required payments, MiMedx employed wrongful means as it enabled Stability to keep monies it already acknowledged were owed to Osiris.

71.     By reason of these actions, MiMedx caused Osiris to incur approximately $3.48 million in compensatory damages in connection with the breaches of the distribution agreement and additional unascertainable, but foreseeable, compensatory damages from Stability's violation of its obligation not to sell competing products and from MiMedx's unjust enrichment and improper competitive advantage through the misuse of Osiris's confidential information.

72.     Further, by reason of their actions, MiMedx caused Osiris to incur approximately $2,950,075 in compensatory damages in connection with the breach of the Ovation Payment Plan.

73.     Because MiMedx and Stability engaged in the above-referenced tortious conduct with malice, Osiris is additionally entitled to punitive damages.

### COUNT 3
### Conspiracy to Breach Contracts

74.     Osiris re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

75.     Again, there are two contracts at issue here: (i) the distribution plan and (ii) the Ovation Payment Plan. Stability and Osiris are parties to each. And under each, Stability owed Osiris contractual obligations.

76.     An entity that is not a signatory to a contract, such as MiMedx, can be held liable for conspiracy to breach it if it participates in an agreement with another that results in a breach. Stability breached each of those agreements, as described.

77.     MiMedx knew of both contracts during or around the time MiMedx negotiated with, and later acquired, Stability. MiMedx and Stability acted together in agreement to cause the various breaches.

78.     By reason of their actions, Osiris incurred approximately $3.48 million in compensatory damages in connection with the breaches of the distribution agreement. Osiris also incurred additional unascertainable, but foreseeable, compensatory damages from Stability's violation of its obligation not to sell competing products and from MiMedx's unjust enrichment and improper competitive advantage.

79.     Further, by reason of their actions, MiMedx caused Osiris to incur approximately $2,950,075 in compensatory damages in connection with the breach of the Ovation Payment Plan.

80.     Because MiMedx and Stability engaged in the above-referenced tortious conduct with malice, Osiris is additionally entitled to punitive damages.

### COUNT 4
### Misappropriation of Osiris's Trade Secrets
### (Uniform Trade Secrets Act)

81.     Osiris re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

82.     Osiris's customer lists, potential customer lists, the identities of its customers, product sales plans, and sales information are trade secrets. That information is not generally known outside of Osiris's business. A competitor's

knowledge of Osiris's confidential information would harm Osiris by giving it a competitive edge. Osiris expended time, labor, and money in developing its confidential information, and because the marketing and sales of Osiris's products are the very lifeblood of its business, this information had independent economic value to Osiris.

83.     Osiris took reasonable efforts to maintain the secrecy of its confidential information, as evidenced by, among other measures, the inclusion of detailed confidentiality clauses in the distribution agreement. Ex. 1, at 012, 1415. Stability and its employees were to receive and maintain such information in strict confidence, use it only to perform their obligations under the agreement, and not disclose it to anyone else. *Id*., at 1415. When the agreement terminated, Stability promised to return or destroy such information. *Id*., at 15. Further, Stability's obligations to maintain the confidentiality of Osiris's confidential information survived the termination of that agreement. *Id*.

84.     The parties also "acknowledge[d] and agree[d]" that the distribution agreement's provisions regarding confidential information were "reasonable and necessary to protect the other Party's interests," and that "any breach … may result in irreparable harm to such other Party and that the remedy at law for such breach may be inadequate." *Id*. "Accordingly, in the event of any breach or threatened

breach … by a Party …, the other Party, in addition to any other relief available to it at law, in equity or otherwise, shall be entitled to seek temporary and permanent injunctive relief … without the necessity of proving actual damages or posting a bond or other security." *Id*.

85.     When Stability was merged with MiMedx's existing operations, its obligations—including those owed to Osiris under the distribution agreement—became those of the surviving company.

86.     MiMedx knew of the distribution agreement, and Stability's ongoing obligations to protect Osiris's confidential information, during or around the time MiMedx negotiated with, and later acquired, Stability.

87.     Upon information and belief, before the distribution agreement's termination date, MiMedx and Stability discussed selling MiMedx products to Osiris customers. This included selling to them MiMedx products that competed with Ovation® and Grafix®.

88.     During the second half of 2015, Stability's sales of Osiris's products significantly dropped to a small fraction of what they were during each of the first ten quarters of their three-year contract.

89.     By the end of 2015, MiMedx had sold millions of dollars of its products through Stability. As of December 31, 2015, Stability owed MiMedx approximately $2 million in connection with those sales.

90.     After MiMedx merged with Stability on January 13, 2016, MiMedx gained access to Osiris's confidential information at a time when it was a wholly owned subsidiary of MiMedx.

91.     Thereafter, upon information and belief, Stability and MiMedx used Osiris's confidential information (which included Osiris's trade secrets, customer lists, potential customer lists, the identities of its customers, product sales plans, and sales information) to sell MiMedx's products to Osiris's customers. Upon information and belief, MiMedx did so for financial gain, even though it knew, or had reason to know, that Stability was contractually obligated to maintain the secrecy of Osiris's confidential information, and limit its use.

92.     Osiris did not consent to Stability's use of its confidential information other than to fulfill Stability's obligations to Osiris under the distribution agreement. Osiris did not consent to MiMedx's use of its confidential information.

93.     By reason of these actions, under the applicable version of the Uniform Trade Secrets Act, MiMedx was unjustly enriched, and Osiris incurred an unascertainable, but foreseeable, amount of compensatory damages and

reputational harm and suffered a competitive disadvantage from MiMedx's misappropriation of Osiris's confidential information.

94.    Because MiMedx's misappropriation of Osiris's confidential information was willful and malicious, Osiris is additionally entitled to exemplary damages and reasonable attorneys' fees.

## COUNT 5
## Unfair Competition
### (*in the alternative to Count 4*)

95.    Osiris re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

96.    Osiris expended time, labor, and money in developing its confidential information, including its trade secrets, customer lists, potential customer lists, the identities of its customers, product sales plans, and sales information.

97.    Osiris and MiMedx are direct competitors, and competition within their industry is intense.

98.    Upon information and belief, MiMedx improperly obtained access to Osiris's confidential information by inducing Stability to disclose Osiris's trade secrets, customer lists, potential customer lists, the identities of its customers, product sales plans, and sales information in breach of the distribution agreement.

99.    MiMedx then misappropriated Osiris's confidential information and used it to target Osiris's customers so that it could sell to them MiMedx's products, including those that directly competed with Osiris's. It also induced Stability to use such confidential information on MiMedx's behalf. MiMedx thus gained an unfair competitive advantage vis-à-vis Osiris. MiMedx's actions jeopardized Osiris's business by deceit, trickery, and unfair methods.

100.    By reason of these actions, Osiris incurred an unascertainable, but foreseeable, amount of compensatory damages and reputational harm and suffered a competitive disadvantage from MiMedx's misappropriation of Osiris's confidential information.

101.    Because MiMedx's misappropriation and misuse of Osiris's confidential information was willful and malicious, Osiris is additionally entitled to punitive damages.

### COUNT 6
**Civil Conspiracy to Misappropriate Osiris's Trade Secrets**
(*in the alternative to Count 4*)

102.    Osiris re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

103.   Osiris's customer lists, potential customer lists, the identities of its customers, product sales plans, and sales information are trade secrets. Again, as previously stated, that information has independent economic value to Osiris and is not generally known to or ascertainable by Osiris's competitors. Osiris took reasonable efforts, as evidenced by, among other measures, the inclusion of detailed confidentiality clauses in the distribution agreement to maintain the secrecy of its confidential information.

104.   Stability was obligated to only use Osiris's confidential information to fulfill its obligations of Osiris under the distribution agreement—and for no other purpose.

105.   Upon information and belief, MiMedx and Stability agreed to misappropriate Osiris's confidential information and to use it for MiMedx's benefit.

106.   Stability disclosed Osiris's confidential information to MiMedx and/or used such information for MiMedx's benefit even though it knew that it acquired that information through the distribution agreement, which gave rise to a contractual duty to maintain the information's secrecy and limited its use.

107.   MiMedx used Stability's knowledge of Osiris's confidential information for financial gain, even though it knew, or had reason to know, that

Stability was contractually obligated to maintain the information's secrecy and limit its use. It also induced Stability to use such confidential information on MiMedx's behalf.

108.   Osiris did not consent to Stability's use of its confidential information other than to fulfill Stability's obligations to Osiris under the distribution agreement. Osiris did not consent to MiMedx's use of its confidential information at all.

109.   By reason of these actions, MiMedx was unjustly enriched, and Osiris incurred an unascertainable, but foreseeable, amount of compensatory damages and reputational harm and suffered a competitive disadvantage from MiMedx's misappropriation and misuse of Osiris's confidential information.

110.   Because MiMedx's and Stability's misappropriation of Osiris's confidential information was willful and malicious, Osiris is additionally entitled to punitive damages.

### COUNT 7
### Civil Conspiracy to Commit Unfair Competition
### (*in the alternative to Count 4*)

111.   Osiris re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

112.    Osiris expended time, labor, and money in developing its confidential information, including its trade secrets, customer lists, potential customer lists, the identities of its customers, product sales plans, and sales information.

113.    Osiris and MiMedx are direct competitors.

114.    MiMedx improperly obtained access to Osiris's confidential information by inducing Stability to disclose Osiris's trade secrets, customer lists, potential customer lists, the identities of its customers, product sales plans, and sales information in breach of the distribution agreement. It also induced Stability to use such confidential information on MiMedx's behalf.

115.    MiMedx and Stability agreed to misappropriate Osiris's confidential information and used it to market and sell MiMedx's products. MiMedx thus gained an unfair competitive advantage vis-à-vis Osiris. MiMedx's and Stability's actions jeopardized Osiris's business by deceit, trickery, and unfair methods.

116.    As a result of these actions, Osiris incurred an unascertainable, but foreseeable, amount of compensatory damages and reputational harm and suffered a competitive disadvantage from MiMedx's misappropriation and misuse of Osiris's confidential information.

117.   Because MiMedx's and Stability's misappropriation of Osiris's confidential information was willful and malicious, Osiris is additionally entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Osiris demands judgment as follows:

118.   Compensatory damages, in an amount yet to be determined, for MiMedx's inducement of Stability's sale of competing MiMedx products at a time when Stability was barred from doing so.

119.   Compensatory damages of approximately $1.28 million for commissions Osiris prepaid that were never earned and never refunded.

120.   Compensatory damages of approximately $2.2 million for Osiris products held in inventory that were never sold or returned, and which expired in MiMedx's and Stability's custody.

121.   Compensatory damages in the approximate amount of $2,950,075 related to the breach of the Ovation Payment Plan.

122.   Contractually specified permanent injunctive relief and damages as the Court deems just and proper for MiMedx's misappropriation and misuse of Osiris's confidential information and the resulting unjust enrichment.

123.    The return of Osiris's confidential information.

124.    Exemplary damages as the Court deems just and proper for MiMedx's willful misappropriation of Osiris's confidential information.

125.    Punitive damages as the Court deems just and proper.

126.    Attorneys' fees and costs in the amount of $321,341.21 expended in pursuit of recovery of these damages in Osiris's arbitration with Stability (in which MiMedx participated).

127.    The costs and disbursements of this action, including reasonable attorneys' fees, accountants' fees, and expert fees.

128.    Interest.

129.    Additional relief as the Court deems just and proper.

### **Jury Demand**

Osiris demands a jury.

Dated: February 20, 2019

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,


/s/ Robert C. Khayat, Jr.
Robert C. Khayat, Jr.
KHAYAT LAW FIRM
75 Fourteenth Street, NE
Suite 2750
Atlanta, GA 30309
Telephone: (404) 978-2750
Facsimile: (404) 978-2901
rkhayat@khayatlawfirm.com


Sandra M. Hanna
(*pro hac vice* application forthcoming)
Rory C. Flynn
(*pro hac vice* application forthcoming)
BRUCH HANNA LLP
1099 New York Avenue, N.W.
Suite 500
Washington, D.C. 20001
Telephone: (202) 969-1633
Facsimile: (202) 969-1625
shanna@bruch-hanna
rflynn@bruch-hanna.com


*Attorneys for Osiris Therapeutics, Inc.*